UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MARTIN ALEXANDER, a/k/a ALEX        :    10 Civ. 5613 (PAC) (JCF)
MARTIN, Plaintiff, an individual    :
                                    :
            Plaintiff,              :         REPORT AND
                                    :         RECOMMENDATION
      - against -                   :
                                    :
KEITH RUPERT MURDOCH, Officer,      :
owner News Corporation, Inc.        :
Defendant, an individual, NEWS      :
CORPORATION, INC., Defendant,       :
a corporation, DISNEY ENTERPRISES,  :
INC., (The Walt Disney Co., Inc.)   :
Defendant, a corporation, ABC,      :
INC., (& Affiliates) wholly owned   :
subsidiary of The Walt Disney Co.,  :
Inc. Defendant, a corporation, FOX  :
ENTERTAINMENT GROUP, INC., wholly   :
owned subsidiary of News            :
Corporation, Inc. Defendant, a      :
corporation, STEVEN LEVITAN,        :
officer, owner and/or doing         :
business as Picture Day Productions :
officer, owner and/or doing         :
business as Levitan & Lloyd         :
Productions Defendant, an           :
individual DBA, CHRISTOPHER LLOYD,  :
officer, owner and/or doing         :
business as Picture Day Productions :
officer, owner and/or doing         :
business as Levitan & Lloyd         :
Productions Defendant, an           :
individual, DBA, PICTURE DAY        :
PRODUCTIONS, INC., Defendant, a     :
corporation, LEVITAN AND LLOYD      :
PRODUCTIONS, INC., Defendant, a     :
corporation, CBS BROADCASTING,      :
INC., Defendant, a corporation,     :
APPLE, INC., Defendant, a           :
corporation, HULU, LLC, joint       :
venture of Fox, ABC, NBC, and       :
Providence Equity Partners,         :

1

```
Defendant, a corporation,          :
AMAZON.COM, INC., Defendant a      :
Corporation, BLOCKBUSTER, INC., a  :
corporation, IMDB.COM, INC.,       :
wholly owned subsidiary of Amazon. :
com, Inc., BRITISH SKY             :
BROADCASTING GROUP, PLC, partially :
owned subsidiary of News           :
Corporation, Inc. Defendant, a     :
foreign corporation, RTL GROUP,    :
Defendant, a foreign corporation,  :
SKY ITALIA, wholly owned subsidiary:
of News Corporation, Inc.,         :
Defendant, a foreign corporation,  :
FOXTEL, wholly owned subsidiary of :
News Corporation, Inc., Defendant  :
a foreign corporation,             :
                                   :
               Defendants.         :
- - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

    Martin Alexander brings this pro se action for copyright infringement, idea misappropriation, and defamation against the creators, producers, distributors, and broadcasters of the television series "Modern Family." He alleges that the defendants unlawfully used ideas and protected expressions from his work, entitled "Loony Ben," in violation of the Copyright Act, 17 U.S.C. § 101 et seq., and New York law. Defendants Keith Rupert Murdoch, News Corporation, Disney Enterprises, Inc., American Broadcasting Companies, Inc., Fox Entertainment Group, Inc., Steven Levitan, Christopher Lloyd, Picture Day Productions, Levitan and Lloyd Productions, CBS Broadcasting, Inc., Apple Inc., Hulu, LLC, Amazon.com, Inc., IMDB.com, Inc., British Sky Broadcasting Group,

PLC, RTL Group, Sky Italia, and FOXTEL Management Pty, Ltd. (collectively, the "moving defendants") now move to dismiss the complaint.[1]  For the reasons that follow, I recommend that their motion be granted.

Background

    A. Loony Ben

Loony Ben is a proposed television situation comedy created by the plaintiff and set in Los Angeles. ("Loony Ben" Pilot ("Treatment"), attached as Exh. 1 to Declaration of Melanie Bradley dated Jan. 21, 2011 ("Bradley Decl."), at 1, 2).  It tells the story of Ben Figiwitz, a 30-year-old Jewish handyman, who suffers from "various mental-psychological problems" including "claustrophobia; fear of crowds; obsessive, compulsive disorder; adult attention deficit disorder; multiple personality disorder; borderline schizophrenia and borderline manic depression." (Treatment at 3).  Despite these diagnoses, Ben "strives to live in a functional world" with the support of his psychiatrist, Dr. Schwartz, a half-African American, half-Jewish man with a combined M.D./J.D. from Columbia University.  (Treatment at 2, 3).  Ben

---

    [1]  Defendant Blockbuster, Inc., which is currently in bankruptcy, does not join this motion because its participation in this litigation is stayed pursuant to 11 U.S.C. § 362(a)(1). (Letter of Melanie Bradley dated Jan. 21, 2011); see, e.g., Wynn v. AC Rochester General Motors Corp., 303 Fed. Appx. 26, 27 n.1 (2d Cir. 2008).

struggles with romantic relationships due to his lack of self confidence and "latent, gender identity confusion[, which] stems from the fact that he was brought-up [sic] by his gay dad and his 'husband.'" (Treatment at 3). Ben's primary love interest is Kelly, a blonde, bisexual librarian. (Treatment at 1, 4, 9). His two ex-wives -- both of whom are described as "sexy," "funny," and "still in love with Ben," although Bling is Asian and Rosa is Latina -- are recurring characters, as are the two preteen children born of those marriages. (Treatment at 1-2). Additional recurring characters include Ben's mother, his mother's girlfriend, his grandmother, his boss, Dr. Schwartz's secretary, and an unnamed nurse at the psychiatric facility where "Ben sometimes finds himself involuntarily committed." (Treatment at 1, 5).

The script for the pilot episode of Loony Ben unfolds in fourteen scenes, including two flashbacks. (Treatment at 6-14). It begins with Ben in Dr. Schwartz's office, discussing his attraction to Kelly. (Treatment at 6-7). The subsequent scenes find Ben promising to host two parties on the same day -- a bachelor party for his ex-brother-in-law and a birthday party for his son, Jesus. (Treatment at 7-8). The overwhelming stress of having to plan the two parties causes Ben to reach out to Dr. Schwartz, who agrees to attend both events and provide Ben with emotional support. (Treatment at 8-9). Ben enlists his boss to

help find a stripper for the bachelor party, but then accidentally sends the stripper to his son's birthday party and the clowns intended for his son's party to the bachelor party. (Treatment at 10). Not realizing his mistake, Ben attends the birthday party, where he introduces Dr. Schwartz to his parents, their significant others, and his ex-wives. (Treatment at 10-12). When Ben realizes that he has misdirected the entertainment, he gets depressed and tries to go to sleep, but Dr. Schwartz insists that Ben stay awake and deal with the mix-up. (Treatment at 13). Ben arrives at the birthday party too late to stop the stripper, who turns out to be Kelly, from popping out of a box to the surprise of onlookers. (Treatment at 14). The episode ends with Ben fainting as Dr. Schwartz tries to revive him. (Treatment at 14).

      B. <u>Modern Family</u>

Modern Family is a half-hour situation comedy that debuted in the United States on the ABC Network in September 2009. (Amended Complaint ("Am. Compl."), ¶¶ 40, 46). It is set in contemporary Los Angeles and follows the everyday lives of three interrelated families. (Am. Compl., ¶¶ 89, 167; Bradley Decl., ¶¶ 47, 153). Each episode divides its plotlines and screen time roughly equally between the three families and their individual members. (<u>E.g.</u>, Episodes of Modern Family ("Modern Family"), attached as Exhs. 2

and 3 to Bradley Decl., 1:1 "Pilot").[2]  Episodes often begin with
multiple family members responding to questions such as "Can people
change?" or "What are you most afraid of?" before moving on to show
different characters involved in scenarios centered on the same
themes.  (E.g., Modern Family 1:13 "Fifteen Percent," 1:16
"Fears").[3]  The show is filmed in a mock documentary style, where
the characters sometimes speak directly to the camera as though
being interviewed.  (E.g., Modern Family 1:1 "Pilot").  Individual
episodes contain an average of twenty-five to thirty scenes.
(E.g., Modern Family 1:1 "Pilot" (twenty-four scenes), 1:2 "Run for
Your Wife" (twenty-seven scenes), 1:3 "The Bicycle Thief" (thirty-
five scenes), 1:4 "Come Fly with Me" (twenty-five scenes)).

   1. Modern Family's Characters

  Claire Dunphy, a stay-at-home mother, and her husband Phil
Dunphy, a real estate agent, live with their three children,
daughters Haley and Alex, and son Luke.  (Modern Family 1:1
"Pilot").  Claire is responsible (Modern Family 1:18 "Starry
Night," 1:23 "Hawaii"), competitive (Modern Family 2:8 "Manny Get
Your Gun"), and protective of her children, especially her eldest

---

[2] Each episode is designated by the season number and a colon,
followed by the number of the episode and the title.

[3] Rather than explicate the plots of all thirty-four relevant
episodes of Modern Family here, I will instead describe specific
plot elements only as necessary to the analysis.

daughter, Haley (Modern Family 1:1 "Pilot").  Phil is a caring father and husband (Modern Family 1:2 "Run for Your Wife," 1:8 "Great Expectations," 1:23 "Hawaii") who craves the approval of his family (Modern Family 1:4 "Come Fly with Me") and frequently struggles to appropriately discipline his children, preferring to be thought of as a "cool dad" (Modern Family 1:1 "Pilot," 1:5 "The Incident," 1:10 "Undeck the Halls").  Haley, their eldest daughter, is a popular high school student (Modern Family 1:1 "Pilot," 2:4 "Strangers on a Treadmill") who frequently clashes with her mother over her desire to go to parties (Modern Family 1:8 "Great Expectations") and spend time with her boyfriend, Dylan (Modern Family 1:1 "Pilot," 1:5 "The Incident").  Alex, the middle child, prides herself on her intelligence (Modern Family 1:4 "Come Fly with Me"), although she increasingly focuses on peer relationships as the series progresses (Modern Family 1:20 "Benched," 2:2 "The Kiss").  Luke, the youngest child, is often a source of concern for Claire and Phil due to his seeming lack of capability and maturity. (Modern Family 1:4 "Come Fly with Me," 1:7 "En Garde").

Claire's father, Jay Pritchett, owns and manages a construction company. (Modern Family 2:7 "Chirp").  He lives with his much younger second wife, Gloria Pritchett, and her preteen son, Manny.  (Modern Family 1:1 "Pilot").  Jay cares about his family but often struggles to express his feelings appropriately

(Modern Family 1:3 "The Bicycle Thief," 1:18 "Starry Night"); he sometimes prefers to pursue personal interests rather than interact with other family members (Modern Family 1:4 "Come Fly with Me," 1:6 "Coal Digger"). Gloria grew up in Colombia and speaks English with a thick accent; her first husband, Manny's father, is also Colombian. (Modern Family 1:2 "Run for Your Wife," 1:11 "Up All Night"). She is an openly emotional person who is deeply loyal to her family and expects the same in return. (Modern Family 1:1 "Pilot," 1:6 "Coal Digger"). Manny is a precocious child who has frequent crushes on various girls and women. (Modern Family 1:1 "Pilot," 1:13 "Fifteen Percent," 1:15 "My Funky Valentine"). He is proud of his Colombian heritage (Modern Family 1:2 "Run for Your Wife") and sometimes struggles to fit in with his peers (Modern Family 1:5 "The Incident," 1:18 "Starry Night").

Mitchell Pritchett is Jay's son and Claire's brother. He lives with his partner, Cameron Tucker, and their adopted Vietnamese daughter, Lily. (Modern Family 1:1 "Pilot"). Mitchell has a law degree from Columbia University and works as an attorney. (Modern Family 1:17 "Truth Be Told," 1:20 "Benched"). He has difficulty relaxing (Modern Family 1:22 "Airport 2010," 1:23 "Hawaii"), dislikes sports (Modern Family 1:6 "Coal Digger"), and is sensitive about his lack of physical prowess (Modern Family 1:19 "Game Changer"). Cameron is primarily a stay-at-home father to

8

Lily.  (Modern Family 1:20 "Benched").  He is a former football player (Modern Family 1:6 "Coal Digger") and can be physically aggressive (Modern Family 1:9 "Fizbo"); however, he also cries easily, dresses flamboyantly, and loves to sing and dance (Modern Family 1:3 "The Bicycle Thief," 1:10 "Undeck the Halls," 1:11 "Up All Night," 2:8 "Manny Get Your Gun").

C. <u>Procedural History</u>

Mr. Alexander filed the original complaint in this action on July 23, 2010 and filed an amended complaint on December 23, 2010. The moving defendants filed this motion on January 21, 2011; because the motion was accompanied by supplemental materials, they also served Mr. Alexander with notice informing him that the motion may be converted into a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Record dated Jan. 21, 2011).[4]

---

[4] I note that the plaintiff's memorandum submitted in opposition to the defendants' motion employs undersized font, cramped spacing, and reduced margins, apparently in an effort to circumvent my refusal to grant a further enlargement of the page limit beyond forty pages.  (Memorandum Endorsement dated March 25, 2011 at 2; Amended Memorandum of Law in Support of Affirmation in Opposition to Defendants' Motion to Dismiss ("Pl. Memo.")).  Such tactics are unacceptable.

Discussion

    A. Legal Standard

    In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 110-11 (2d Cir. 2010). A complaint need not make "'detailed factual allegations,'" but it must contain more than mere "'labels and conclusions'" or "formulaic recitation[s] of the elements of a cause of action.'" Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949-50 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Where the complaint's factual allegations permit the court to infer only that it is possible, but not plausible, that misconduct occurred, the complaint fails to meet the minimum standard. Id. at __, 129 S. Ct. at 1950. In ruling on a motion to dismiss, the court's task "'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)).

Pro se complaints are held to less stringent standards than those drafted by lawyers. Erickson, 551 U.S. at 94; see also McKeown v. New York State Commission on Judicial Conduct, 377 Fed. Appx. 121, 122 (2d Cir. 2010). In fact, pleadings of a pro se party should be read "'to raise the strongest arguments that they suggest.'" Kevilly v. New York, No. 09-4635, 2010 WL 5156766, at *1 (2d Cir. Dec. 21, 2010) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)). Even after Iqbal, in which the Supreme Court imposed heightened pleading standards for all complaints, pro se complaints are to be liberally construed. See Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009). Dismissal of a pro se complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements. See, e.g., Paul v. Bailey, No. 09 Civ. 5784, 2010 WL 3292673, at *4 (S.D.N.Y. July 21, 2010) (citing Rodriguez v. Weprin, 116 F.3d 62, 65 (2d Cir. 1997)), report and recommendation adopted, 2010 WL 3292672 (S.D.N.Y. Aug. 18, 2010).

On a motion to dismiss, the court is generally limited to reviewing the allegations in the complaint and documents attached to it or incorporated by reference. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-54 (2d Cir. 2002). However, the court may also consider documents "'integral to the complaint'" or those that were necessarily relied on by the plaintiff in drafting the

11

complaint.  Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)
(emphasis omitted) (quoting Cortec Industries, Inc. v. Sum Holding
L.P., 949 F.2d 42, 47 (2d Cir. 1991)).[5]

    B. Copyright Infringement

       1. Applicable Law

In order to establish copyright infringement, a plaintiff must
demonstrate that (1) his copyright is valid, (2) the defendant
actually copied his work, and (3) "'the copying is illegal because
a substantial similarity exists between the defendant's work and
the protectible elements of [the] plaintiff's.'"  Peter F. Gaito
Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 63 (2d
Cir. 2010) (quoting Hamil America Inc. v. GFI, 193 F.3d 92, 99 (2d
Cir. 1999)); see also Crown Awards, Inc. v. Discount Trophy & Co.,
326 Fed. Appx. 575, 576 (2d Cir. 2009); Tufenkian Import/Export

---

   [5] The moving defendants have paved the way for conversion of
their motion into one for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure by submitting additional
documents in support of their motion and serving the plaintiff with
the required notice.  Nevertheless, conversion is not necessary
here.  The additional materials submitted by the parties -- the
copyrighted and allegedly infringing works, plot and character
summaries, and video interviews of Modern Family producers and
actors -- all present or summarize content that was relied upon by
the plaintiff in drafting his complaint.  And, as will be discussed
below, copyright actions that consider the legal issues raised here
are appropriately addressed in a motion to dismiss.  Therefore, I
will continue to treat this motion as one for dismissal of the
complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.

Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003).  For purposes of this motion, the moving defendants concede that Mr. Alexander holds a valid copyright for Loony Ben and that they had access to the Treatment; however, they argue that his copyright infringement claim nevertheless fails because there exists no substantial similarity between the works.  (Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Memo.") at 6-7).

Preliminarily, I note that substantial similarity is appropriately addressed here in the context of a motion to dismiss. Peter F. Gaito Architecture, 602 F.3d at 64 (2d Cir. 2010) ("[W]here, as here, the works in question are attached to a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."); accord Allen v. Scholastic Inc., 739 F. Supp. 2d 642, 655 (S.D.N.Y. 2011).

"'The standard test for substantial similarity . . . is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" Lapine v. Seinfeld, 375 Fed. Appx. 81, 82 (2d Cir. 2010) (second alteration in original) (quoting Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir.

2001)).    However,  where  a  copyrighted  work  contains  both
protectable  and  unprotectable  elements,  courts  apply  "a  more
discerning  observer  test,  which  requires  substantial  similarity
between  those  elements,  and  only  those  elements,  that  provide
copyrightability  to  the  allegedly  infringed  [work]."    Id. at 83
(alteration  in  original)  (internal  quotation  marks  omitted).
Unprotectable  elements  include  ideas,  see  Jones v. CBS, Inc.,  733
F. Supp. 748, 752 (S.D.N.Y. 1990) ("It is an axiom of copyright law
that  copyright  protection  is  limited  to  an  author's  original
expression  of  an  idea  and  does  not  extend  to  the  idea  itself.");
scènes à faire,  see  MyWebGrocer, LLC v. Hometown Info, Inc.,  375
F.3d 190, 194  (2d Cir. 2004)  (describing  scènes à faire  as
"elements  that  follow  naturally  from  a  work's  theme  rather  than
from an author's creativity"); and "'words, short phrases, titles,
and slogans,'"  Lewinson v. Henry Holt and Co.,  659 F. Supp. 2d 547,
568 (S.D.N.Y. 2009) (quoting  Moody v. Morris,  608 F. Supp. 2d 575,
579 (S.D.N.Y. 2009)).

      Yet  in  addition  to  evaluating  the  similarity  between  the
works'  protectable  elements,  the  court  must  also  compare  "'the
contested [work's] total concept and overall feel with that of the
allegedly infringed work, as instructed by [the viewer's] good eyes
and  common  sense.'"    Allen,  739  F.  Supp.  2d  at  654  (first
alteration in original) (quoting Peter F. Gaito Architecture, 602

14

F.3d at 66); see also Psihoyos v. National Geographic Society, 409 F. Supp. 2d 268, 274 (S.D.N.Y. 2005) ("The discerning ordinary observer inquiry entails not a piecemeal comparison of each of the protectible elements with its putative imitation, but rather a careful assessment of the total concept and feel of the works at issue, after the non-protectible elements have been eliminated from consideration." (internal quotation marks omitted)).  This is because "a work may be copyrightable even though it is entirely a compilation of unprotectible elements," so long as those elements are arranged in an original manner.  Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1003-04 (2d Cir. 1995) (citing Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 362 (1991)); accord Crown Awards, 326 Fed. Appx. at 579.

When assessing substantial similarity with respect to television shows, courts consider a variable list of characteristics, including primarily "plot, characters, total concept and feel (mood), setting, format and pace."  Robinson v. Viacom International, Inc., No. 93 Civ. 2539, 1995 WL 417076, at *8 (S.D.N.Y. July 13, 1995); see also Blakeman v. The Walt Disney Co., 613 F. Supp. 2d 288, 306-08 (E.D.N.Y. 2009) (comparing "themes, plots, scenes, characters, structure, sequence, feel [and] pace" of film treatment and motion picture); Willis v. Home Box Office, No. 00 Civ. 2500, 2001 WL 1352916, at *2-5 (S.D.N.Y. Nov. 2, 2001)

(comparing characters, themes, settings, and dramatic devices of situation comedy treatment and television show); <u>Jones</u>, 733 F. Supp. at 752-54 (comparing characters, plots, scenes, and "feel" of radio pilot script and television show).

    2. <u>Application</u>

      a. <u>Plot</u>

The plaintiff has identified a number of similarities between the plot of Loony Ben and those of various Modern Family episodes. These comparisons, however, are totally insufficient to establish substantial similarity.  The plaintiff's primary claim of plot similarity is that both works depict children's birthday parties where things go wrong.  (Am. Compl., ¶ 174).  However, children's birthday parties are scènes à faire in family-focused situation comedies and thus do not enjoy copyright protection.  Moreover, there are no factual similarities between the parties depicted; although there are a number of birthday parties in different episodes of Modern Family, none involves a stripper showing up at a party or a mix-up of presents.  (Treatment at 10, 14; Modern Family 1:9 "Fizbo," 1:19 "Game Changer," 1:23 "Hawaii," 2:8 "Manny Get Your Gun").

    Similarly, the comedic devices shared by both works and identified by the plaintiff -- characters driving recklessly, men slapping each other on the backside, people drinking alcohol as a

16

means to cope with a stressful family situation -- are common plot elements and thus are not subject to copyright protection.  (Am. Compl., ¶¶ 181-82, 187-88, 195-96); see Robinson, 1995 WL 417076, at *7 ("Copyright protection does not extend to stock themes commonly linked to a particular genre." (internal quotation marks omitted)); Jones, 733 F. Supp. at 754 ("[B]asic plot ideas involving voodoo as a dramatic exposition of culture or a missing body as a comedic prop are not protectable.").

The remaining plot similarities identified by the plaintiff are alleged at an overly-abstract level of generality.  "It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots."  Jones, 733 F. Supp. at 753.  Therefore, alleged similarities in plot cannot be drawn at "too abstract a level to merit copyright protection."  Robinson, 1995 WL 417076, at *10. The plaintiff first alleges that Loony Ben and Modern Family are substantially similar because both depict a character singing a sexually inappropriate song at a family gathering.  (Am. Compl., ¶¶ 168-69).  Yet the details of these scenes render them significantly different.  In the Treatment, Ben's mother's girlfriend -- a "[m]ature," "sexy 'lipstick' lesbian" -- interrupts a child's birthday party to sing "Happy Birthday" in the hyper-sexualized style of Marilyn Monroe.  (Treatment at 2, 13-14).  In

Modern Family, Haley's teenage boyfriend Dylan is encouraged during a family get together to play a love song he had written for Haley; the song turns out to contain lyrics about Dylan's desire to have sex with Haley.  (Modern Family 1:5 "The Incident").  Thus, the songs, the singers, and the contexts are markedly different and cannot support a finding of substantial similarity.

The plaintiff also alleges that both works contain a scene where a "Latino boy looks up and voices his approval at the sight of a beautiful, adult woman who [pops/walks] up and stands in front of him."  (Am. Compl., ¶¶ 189-90).  Again, a closer look at the details of these scenes shows that they bear scant resemblance to each other.  In the Treatment, Ben's 12-year-old, biracial son, Jesus, says "Cooooooooooool!" when a stripper pops out of a box at his birthday party.  (Treatment at 2, 14).  In Modern Family, Manny nods satisfactorily as he looks around the lobby of the family's hotel in Hawaii while a hotel employee places a string of beads around his neck, then matter-of-factly says, "I'm home."  (Modern Family 1:23 "Hawaii").  The phrasing and meaning of these comments are plainly different, as are the situations in which they occur.  Similarly unsustainable is the plaintiff's allegation that both works feature a women who sheds her "dowdy" clothes, "fixes her hair," and "becomes beautiful."  (Am. Compl., ¶¶ 191-92).  There is simply no similarity between Kelly's transformation from a

librarian with "glasses, no make-up and dowdy, unflattering, spinster clothes" into a stripper who provides entertainment at bachelor parties and Claire's decision to change from pajamas into street clothes and put on lipstick upon learning that handsome firefighters are coming to her house. (Treatment at 4, 14; Modern Family 1:11 "Up All Night").

Next, the plaintiff finds substantial similarity in both works' use of scenes depicting "therapy session[s]," at the end of which the therapist character says that he will see the patient the following week. (Am. Compl., ¶¶ 193-94). Scenes involving therapy sessions, which typically end with the therapist adjourning until the next week's session, are arguably scènes à faire in television shows about contemporary American family life; moreover, the scenes in question here are utterly distinct. The Treatment begins with Ben in the midst of a therapy session with Dr. Schwartz, a psychiatrist, whom he sees on a weekly basis; Ben is discussing his feelings for Kelly. (Treatment at 6-7). The scene the plaintiff refers to in Modern Family depicts Claire confiding in Manny, her 10-year-old step-brother, about her relationship with her children -- it is clearly a parody of a therapy session and bears no substantial resemblance to the actual therapy session depicted in the Treatment. (Modern Family 1:4 "Come Fly with Me").

Finally, the plaintiff claims that the works are similar

19

because they both have characters who say the word "Martians."
(Am. Compl., ¶¶ 185-86).  The word "Martians" is not in itself
copyrightable.  See Lewinson, 659 F. Supp. 2d at 568.  Furthermore,
the contexts in which the word is uttered -- a child wearing a
shower cap and carrying a blow dryer who calls himself a "bathroom
martian" on one hand and a grown man speculating that martians are
secretly communicating information to his ex-wife on the other --
are so different as to make any comparison implausible.  (Treatment
at 8; Modern Family 1:23 "Hawaii").  The plaintiff has thus failed
to establish a substantial similarity between the plot of Loony Ben
and that of any Modern Family episode.

   b. Characters

   When comparing two characters, "a court must consider the
totality of their attributes and traits."  Robinson, 1995 WL
417076, at *9 (internal quotation marks omitted).  Thus, "'[n]o
character infringement claim can succeed unless [the] plaintiff's
original conception sufficiently developed the character, and [the]
defendants have copied this development and not merely the broader
outlines.'"  Hogan v. DC Comics, 48 F. Supp. 2d 298, 310 (S.D.N.Y.
1999) (quoting Smith v. Weinstein, 578 F. Supp. 1297, 1303
(S.D.N.Y.), aff'd, 738 F.2d 419 (2d Cir. 1984)); see also Lewinson,
659 F. Supp. 2d at 574 ("'[T]he less developed the characters, the
less they can be copyrighted; that is the penalty an author must

bear for marking them too indistinctly.'" (quoting <u>Nichols v.</u> <u>Universal Pictures Corp.</u>, 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.)). As a result, "basic character types" and "stock characters" are not copyrightable. <u>Lewinson</u>, 659 F. Supp. 2d at 567-68, 574; <u>Jones</u>, 733 F. Supp. at 753.

The plaintiff alleges that substantial similarities exist between multiple sets of characters in Loony Ben and Modern Family. I will address each comparison in turn.

### i. <u>Ben and Phil</u>

The plaintiff's most substantial comparison is between Ben Figiwitz and Phil Dunphy, whom he alleges are similar in their physical appearance, psychological problems, childishness, "sexual[] ambigu[ity]," and love of rock stars. (Am. Compl., ¶¶ 117-24). However, these alleged similarities do not stand up to sustained examination. First, the plaintiff claims that Ben and Phil are similar in their physical appearance because both are tall, dark-haired, middle-aged, Jewish men. (Am. Compl., ¶¶ 117-18). Although both men are dark-haired, Ben is neither tall nor middle-aged, and Phil is not Jewish. (Treatment at 1 (Ben is played by actor Ben Stiller, who is below average height), 3 (Ben is thirty years old); Modern Family 1:10 "Undeck the Halls" (Phil celebrates Christmas)). There is no substantial similarity to be found between two characters who share only their sex and hair

color.  See Hogan, 48 F. Supp. 2d at 311-12 (finding two works not substantially similar despite each starring a "half-vampire and half-human" character named "Nicholas Gaunt" because additional differences overwhelmed these similarities).

Second, Phil does not suffer from psychological problems akin to Ben's many ailments, which include multiple personality disorder, borderline schizophrenia, and borderline manic depression. (Treatment at 3). The plaintiff attempts to minimize Ben's psychological problems by claiming that these disorders are not serious and that "Ben's mental illnesses are mainly a way to justify Ben's funny and quirky personality and behavior." (Pl. Memo. at 4, 19-20). But this does not alter the fact that Ben's psychological problems comprise one of the basic elements of the Treatment, which relies on Ben being "Loony" and "dysfunctional." (Treatment at 1, 3). In contrast, Phil has no diagnosed psychological disorders. He is afraid of clowns (Modern Family 1:9 "Fizbo") and dark, confined spaces (Modern Family 1:16 "Fears"), but many other characters on Modern Family also possess such incidental fears (e.g., Modern Family 1:16 "Fears" (Manny is afraid of roller coasters), 1:22 "Airport 2010" (Claire is afraid of flying), 1:24 "Family Portrait" (Mitchell is afraid of pigeons), 2:3 "The Earthquake" (Manny is afraid of butterflies)). Phil also may have attention deficit hyperactivity disorder (Modern Family

22

1:18 "Starry Night"); however, this disorder does not limit Phil's functionality or require him to seek psychotherapy or take medication as do Ben's diagnoses. (Treatment at 6-7, 9). Finally, the plaintiff's claim that Phil is a hypochondriac who takes pills (Am. Compl., ¶ 120) does not comport with the facts of the episode to which he refers, wherein Phil experiences severe pain due to a kidney stone (Modern Family 1:11 "Up All Night").

Third, the plaintiff alleges that both Ben and Phil are childish and suffer from "Peterpanism." (Am. Compl., ¶¶ 117-18; Amended Affirmation of Martin Alexander dated March 29, 2011 ("Pl. Aff."), ¶ 32). An adult male character who acts in childish ways is a basic character type that is not in itself copyrightable. See Jones, 733 F. Supp. at 753. And the alleged means through which Phil expresses his childishness -- playing with children's toys, wanting to go to camp, telling his children to treat him as a peer rather than a parent -- do not appear anywhere in the Treatment. (Am. Compl., ¶ 118; Modern Family 1:1 "Pilot," 1:11 "Up All Night," 1:16 "Fear," 2:8 "Manny Get Your Gun").

Fourth, the plaintiff describes both Ben and Phil as "sexually ambiguous." (Am. Compl., ¶¶ 121-22). What the plaintiff means by "sexually ambiguous" is itself ambiguous; he appears to be referring in part to instances where the characters engage in non-gender stereotypical behavior, such as a man performing as a

cheerleader or enjoying Hugh Grant movies. (Am. Compl., ¶¶ 121-22). However, the plaintiff also appears to argue that both Ben and Phil have "latent" or "subconscious[]" sexual attraction to other men. (Am. Compl., ¶¶ 121-22). With respect to the first allegation, there is nothing copyrightable about a character who does not conform to gender stereotypes; with respect to the specific non-gender stereotypical characteristics allegedly possessed by Ben and Phil, the only one they appear to share is that they each occasionally cook. (Am. Compl., ¶¶ 121-22; Treatment at 2; Modern Family 2:7 "Chirp"). This is insufficient to show substantial similarity given the vast array of other hobbies and personal preferences Ben and Phil do not share. With respect to the claim that Ben and Phil are both attracted to men, there is no evidence that Phil has "latent, homosexual tendencies." (Am. Compl., ¶ 122). Phil has been married to a woman for sixteen years (Modern Family 1:1 "Pilot"), and there are references to his past relationships, also with women (Modern Family 1:5 "The Incident," 1:17 "Truth Be Told"). The plaintiff mischaracterizes an incident between Phil and Jay wherein Phil falls on top of Jay in a hammock; it is clear from the episode that Phil was merely attempting to help Jay -- there is no evidence of sexual attraction between them. (Modern Family 1:23 "Hawaii"). Similarly, Phil's affectionate comments to his brother-in-law Mitchell in "Airport

2010" do not suggest that Phil is sexually attracted to men.  (Am. Compl., ¶ 122; Modern Family 1:22 "Airport 2010").

Fifth, the plaintiff alleges that both Ben and Phil are "obsessed with rock stars."  (Am. Compl., ¶ 118).  The Treatment states that Ben "dreams of being a rock and roll star," which leads him to frequently impersonate famous rock musicians.  (Treatment at 3).  However, there is no evidence that Phil shares either Ben's dream or his behavior.  The plaintiff is correct that Phil spent a summer following the musical duo Hall & Oats around the United States, but his motivation appears to have been his interest in a girl who was also following Hall & Oats that summer rather than any desire to be a musician himself.  (Modern Family 1:5 "The Incident").  The plaintiff also points to Phil's impersonation of the "pop singers/stars of 'High School Musical'" as substantially similar to Ben's impersonation of various rock and roll musicians.  (Am. Compl., ¶¶ 203-04).  The scene itself, however, makes clear that Phil does not desire to be a pop star like the actors on "High School Musical" but rather wants his children to think that he is cool because he knows the movie's lyrics and dance steps.  (Modern Family 1:1 "Pilot").  Thus, there is no evidence that Phil shares Ben's dream of being a rock musician or his resulting tendency to impersonate rock stars.

Finally, the plaintiff claims that Ben and Phil are

substantially similar because they are both attracted to blonde women. (Am. Compl., ¶¶ 153-54). This comparison is unavailing because neither character is attracted exclusively to blonde women. Although Ben is attracted to Kelly, a blonde woman, he also states that he has never dated a blonde woman. (Treatment at 7). Phil has been with his blonde wife, Claire, for sixteen years. (Modern Family 1:1 "Pilot"). However, Phil is also attracted to women who are not blonde -- for example, his high school girlfriend, Denise, and his mother-in-law, Gloria. (Modern Family 1:1 "Pilot," 1:17 "Truth Be Told," 1:23 "Hawaii"). Therefore, it is more accurate to say that both Ben and Phil are attracted to women, blonde or otherwise. Furthermore, attraction to blonde women cannot be said to be a rare or unique character trait; it is a basic character type and is not copyrightable.

## ii. Rosa and Gloria

The plaintiff also claims that Rosa and Gloria are substantially similar because each is "a stunningly beautiful, fiery, temperamental, Latina mother, with a thick accent, who's in love with her Caucasian [ex-husband/husband] and always makes him do the right thing, especially where her son is concerned." (Am. Compl., ¶¶ 125-26). The flaw in this comparison is that Rosa is a stock character and therefore not copyrightable. See Lewinson, 659 F. Supp. 2d at 567. Rosa has only eight lines of dialogue; the

26

Treatment does not present her as a developed character but rather as a stereotype of a passionate Latina woman.  (Treatment at 8, 14); see Lewinson, 659 F. Supp. 2d at 567-68 ("If a [stock character such as a] drunken old bum were a copyrightable character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, [and] a masked magician." (first alteration in original) (quoting Gaiman v. McFarlane, 360 F.3d 644, 660 (7th Cir. 2004)); Willis, 2001 WL 1352916, at *3 ("Arliss Michaels and Tym Barker are not the same character; they are both stereotypes of the amoral talent agent.").  Because Rosa is not a copyrightable character, the plaintiff can only show substantial similarity between Rosa and Gloria by pointing to specific scenes, dialogue, or plots that demonstrate such similarity.  He has failed to do so.  In the Treatment, Rosa is shown upbraiding her ex-husband Ben for forgetting to plan their son's birthday party and later for allowing a stripper to show up at the party.  (Treatment at 8, 14).  There are no similar scenes in Modern Family.  Although Gloria is occasionally shown encouraging Jay to deal differently with Manny, ultimately he is portrayed as a loving and responsible husband and step-father; there is no instance in which he forgets or neglects his step-son's birthday (Modern Family 1.1 "Pilot," 1:17 "Truth Be told," 2:8

"Manny Get Your Gun").

The plaintiff also argues that Rosa and Gloria are similar because both share a "latent sexual chemistry" with Ben and Phil, respectively.  (Am. Compl., ¶¶ 129-30).  This similarity is not supported by the works themselves.  Although the Treatment states that Rosa "still harbors romantic feelings for Ben," there are no specific expressions of those feelings in the Treatment; rather, Rosa seems frustrated and annoyed by Ben's irresponsibility. (Treatment at 5, 8, 14).  Also, Ben is not portrayed as being attracted to Rosa; thus, it is unclear that they share any sexual chemistry.  Similarly, while Phil clearly finds Gloria physically attractive, it is equally clear that Gloria has no attraction to Phil and is either unaware of or confused by his occasional inappropriate behavior.  (Modern Family 1:1 "Pilot," 1:5 "The Incident," 1:6 "Coal Digger," 1:23 "Hawaii").  Without mutual attraction, Phil and Gloria cannot share any sexual chemistry.

The lone existing similarity between Rosa and Gloria is that both were designed to be played by the actress Sofia Vergara. (Treatment at 1; Modern Family 1:1 "Pilot").  However, this coincidence is insufficient on its own to prove a copyright violation.  The nature of an actor's work is that he transforms himself into the role in which he is cast; the plaintiff suggests here that the reverse is true: that any role played by Sofia

28

Vergara would necessarily be the same as any other. This is clearly nonsensical. Furthermore, the plaintiff does not have a copyrightable interest in characters designed to take advantage at Ms. Vergara's specific attributes. Thus, the plaintiff's allegation that Rosa and Gloria are substantially similar because the same actress has the capacity to play each role is insufficient to meet his burden.

iii. <u>Jesus</u>

The plaintiff variously alleges that Ben's son, Jesus, is substantially similar to three different characters on Modern Family -- Manny, Dylan, and Phil. (Am. Compl., ¶¶ 131-34, 143-44, 151-52). All of these comparisons fail. A "cute," preteen, "juvenile delinquent" who "thinks he is a gangster-rapper from Bed-Sty," Jesus has only one line in the entire Treatment. (Treatment at 2, 14). Thus, Jesus is insufficiently developed to be copyrightable. <u>See</u> <u>Jones</u>, 733 F. Supp. at 753 ("[O]nly a uniquely developed character with some degree of novelty is copyrightable."). The plaintiff claims here that Jesus possesses additional characteristics and behaviors that make him substantially similar to the characters on Modern Family. For example, he describes Jesus as "a wannabe Don Juan with . . . a fetish for older women," much like Manny; however, this characterization has no basis in the Treatment and thus cannot

29

support an allegation of substantial similarity. (Am. Compl.,
¶ 133); Peter F. Gaito Architecture, 602 F.3d at 64 ("In copyright
infringement actions, the works themselves supersede and control
contrary descriptions of them, including any contrary allegations,
conclusions or descriptions of the works contained in the
pleadings." (internal quotation marks and citations omitted)).
Therefore, the only observable similarity between Jesus and Manny
is that the former is half-Latino and the latter is Colombian.
This is insufficient to support a finding of substantial
similarity.

The plaintiff similarly overreaches in trying to find
similarities between Jesus and Dylan, describing both as "cool,"
"Latino" or "Latino looking" "heartthrob[s]." (Am. Compl., ¶¶ 151-
52). Setting aside the subjective nature of characterizations such
as "cool" and "heartthrob" and the utter lack of evidence that
Dylan is Latino or even "Latino looking," these claimed
similarities still fall short of the specific allegations necessary
to prove substantial similarity where the comparison involves an
uncopyrightable character. See Walker v. Time Life Films, Inc.,
784 F.2d 44, 50 (2d Cir. 1986) (finding no substantial similarity
where book and film "feature as central characters third- or
fourth-generation Irish policemen who live in Queens and frequently
drink" because "the familiar figure of the Irish cop" is

uncopyrightable stock character).

In a final attempt, the plaintiff claims that Phil, whom he now compares to Jesus instead of Ben, is substantially similar to Jesus because each is "a non-African-American character[] who speak[s] Ebonics and 'act[s] Black.'" (Am. Compl., ¶¶ 143-44). However, the Treatment does not depict Jesus speaking Ebonics or otherwise "act[ing] Black" -- the one line Jesus utters is "Cooooooooooool!" in response to a stripper's appearing at his birthday party. (Treatment at 14). Phil does not utter a similar line or appear in a similar situation in any Modern Family episode. Therefore, this comparison fails.

### iv. Ben's Unnamed Daughter and Lily

The plaintiff alleges that Ben's unnamed daughter is substantially similar to Lily. As with Jesus, Ben's unnamed daughter is insufficiently developed to be copyrightable -- the Treatment does not give her a name or any lines, and she is described only as "Bi-Racial/Jewish-Asian, very cute but punk/Goth type, dresses like Brittany Spears, piercing, tattoos, etc. . . . ., about 13 years old." (Treatment at 6). Even if this description were sufficient to make the character copyrightable, there is a blatant lack of similarity between Ben's unnamed daughter and Lily. Lily is not bi-racial or Jewish; she is entirely Vietnamese. Lily can certainly be described as "cute," but she is an infant whereas

Ben's unnamed daughter is thirteen years old.  (Modern Family 1:1 "Pilot").  And, although the plaintiff makes much of the fact that Cameron occasionally dresses Lily in various themed outfits, she is never dressed as a "punk/Goth type" or "like Brittany Spears" or given piercings or tattoos.  (Am. Compl., ¶ 138; Modern Family 1:2 "Run for Your Wife").  Therefore, this comparison fails.

v. <u>Herb/Marv and Mitchell/Cameron</u>

The plaintiff claims that Herb and Marv are substantially similar to Mitchell and Cameron because both couples are comprised of two gay men, one of whom is heavyset while the other is "height-weight proportionate," where the heavyset character is also "the more masculine figure."  (Am. Compl., ¶¶ 139-40).  The idea of a gay male couple wherein one partner is overweight and the other is average weight cannot be copyrighted.  Moreover, it is not clear that Cameron is "the more masculine" figure in his relationship with Mitchell.  Although Cameron likes sports and is the more physically imposing of the pair, he is also more openly emotional, dresses more flamboyantly, and prefers being a stay-at-home dad to working.  (Modern Family 1:3 "The Bicycle Thief," 1:6 "Coal Digger," 1:9 "Fizbo," 1:10 "Undeck the Halls," 1:11 "Up All Night," 1:20 "Benched," 2:8 "Manny Get Your Gun").  Thus, while Herb and Marv divide their gender roles along relatively stereotypical lines, Mitchell and Cameron do not separate as evenly into

"feminine" and "masculine" gender stereotypes.  The two couples are therefore not substantially similar.

### vi. Dr. Schwartz

The plaintiff variously alleges substantial similarity between Dr. Schwartz and three characters in Modern Family -- Mitchell, Jay, and "the documentary filmmaker." (Am. Compl., ¶¶ 141-42, 149-50, 157-62).  None of these comparisons has merit.  The only similarity alleged between Dr. Schwartz and Jay is that they are both from Cleveland, Ohio. (Am. Compl., ¶¶ 149-50).  It is unclear that Jay is from Cleveland; even if he were, this comparison is utterly inconsequential since it does not play into the dialogue, plots, or character development of either work.  And while the plaintiff is correct that both Mitchell and Dr. Schwartz obtained law degrees from Columbia University, this fact, on its own, is insufficient to establish substantial similarity between the two characters, especially given that Dr. Schwartz works as a psychiatrist while Mitchell is a practicing attorney. (Am. Compl., ¶¶ 141-42).  The plaintiff further argues that both Dr. Schwartz and Mitchell dress "stylishly," but this vague similarity is insufficient in light of the other significant differences between the two characters -- Mitchell is not African American or Jewish, he did not go to Brandeis University, he does not have advanced degrees other than a J.D., and he could not be described as a

33

"younger Doogie Houser type." (Treatment at 2). Thus, the comparison fails.

Finally, the plaintiff alleges substantial similarity between Dr. Schwartz and "the documentary filmmaker" to whom the Modern Family characters "bear [sic] their souls" in each episode. (Am. Compl., ¶¶ 157-62). This comparison runs aground because the documentary filmmaker is not an actual character with a name or personality but rather a device used to facilitate Modern Family's mock documentary format. Thus, there can be no substantial similarity between the character of Dr. Schwartz and the concept of the documentary filmmaker.

### vii. <u>Additional Comparisons</u>

The plaintiff draws a number of untenable comparisons between various uncopyrightable stock characters that appear in both works. First, he claims substantial similarity between Lila, Ben's mother's girlfriend, and Sal, a friend of Mitchell and Cameron. (Am. Compl., ¶¶ 155-56). Although the plaintiff is correct that both of these characters are "uninhibited" women, there is no evidence that Sal is gay. (Treatment at 6, 13-14; Modern Family 1:8 "Great Expectations"). Moreover, the characters do not share any dialogue or storylines; thus, there is no substantial similarity between them. Second, the plaintiff draws a comparison between Ben's "hard, slave-driver boss," Mr. Muriello, and

34

Mitchell's unnamed first boss, who appears briefly in a single episode. (Am. Compl., ¶¶ 183-84; Modern Family 1:17 "Truth Be Told"). Neither character is sufficiently developed to be copyrightable; furthermore, it is clear that their differences overwhelm their similarities -- they are not physically similar, have different professions, and do not share any dialogue. Third, the plaintiff alleges that substantial similarity exists between Ben's "funny, quirky Jewish Grandmother" and DeDe Pritchett, Claire and Mitchell's mother and Jay's ex-wife. (Treatment at 2; Am. Compl., ¶¶ 177-80). This comparison is untenable because Ben's grandmother is an underdeveloped character with only four lines of dialogue. (Treatment at 2, 6, 12-13). Although she shares with DeDe Pritchett a tendency to criticize family members, there are numerous other characteristics attributable to DeDe Pritchett -- for example, her "new age" beliefs, relationship with a Canadian man, and animosity towards her ex-husband's new wife -- that are not shared by Ben's grandmother. (Modern Family 1:5 "The Incident"). And despite the paucity of facts in the Treatment about Ben's grandmother, there appear to be further substantial differences between the two characters: DeDe is significantly younger than Ben's grandmother; she is also not Jewish. (Treatment at 6; Modern Family 1:5 "The Incident"). These characters are therefore not substantially similar.

35

Next, the plaintiff draws a variety of minor comparisons between various characters and character types that appear in both works.  None of these comparisons holds up under scrutiny.  Cf. Blakeman, 613 F. Supp. 2d at 310 ("[L]ists of 'similarities,' like the one that plaintiff has provided, 'are inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works.'" (quoting Williams v. Crichton, 84 F.3d 581, 590 (2d Cir. 1996) (internal quotation marks omitted)).  First, the plaintiff states that both works feature "an older, popular, television star who appeared on a long running classic sitcom." (Am. Compl., ¶¶ 170-71).  The plaintiff, however, neglects to identify these actors, by name or description, or to allege any similarities between the characters they portray.  Next, the plaintiff claims that both works have characters with "funny Jewish names." (Am. Compl., ¶¶ 197-98).  In particular, he points to the surname "Figiwitz" from Loony Ben and the names "Shell Turtlestein" and "Pepper Saltzman" from Modern Family.  (Am. Compl., ¶¶ 197-98).  It is not obvious why the name Figiwitz is funny, whereas both of the names featured in Modern Family are plainly designed to be humerous.  "Shell Turtlestein" is the name of Manny's pet turtle; there is no indication that either the turtle or Manny is Jewish or that the name was intended to refer to Judaism rather than to children's author Shel Silverstein.  (Modern

36

Family 1:17 "Truth Be Told"; Bradley Decl., ¶ 89).  Similarly,
Pepper Saltzman, a friend of Mitchell and Cameron, does not
identify as Jewish, and his name appears to be a purposely
ridiculous reference to the words salt and pepper.  (Modern Family
1:1 "Pilot," 2:3 "The Earthquake"; Bradley Decl., ¶ 89).

Finally, the plaintiff claims substantial similarity between
the works because both feature "sexually ambiguous" characters and
Jewish characters.  (Am. Compl., ¶¶ 145-48).  Neither comparison is
persuasive.  As discussed above, it is unclear what the plaintiff
means by "sexually ambiguous."  The character he identifies as
"sexually ambiguous" in the Treatment (aside from Ben, discussed
above) is Kelly, a woman who identifies as a lesbian but may in
fact be bisexual.  (Am. Compl., ¶ 145; Treatment at 4).  There is
no evidence that Kelly acts or dresses in stereotypically masculine
ways; rather, her "sexual ambigu[ity]" appears to arise from her
confusion regarding her sexual orientation.  In contrast, the two
Modern Family characters whom the plaintiff identifies as "sexually
ambiguous" (aside from Phil, discussed above) both unequivocally
identify as heterosexual.  Although Alex occasionally displays non-
gender conforming behavior -- for example, refusing to wear a dress
-- there is no suggestion that she is attracted to women or
confused about her sexual orientation.  (Modern Family 1:4 "Come
Fly with Me").  Similarly, although Shorty, a friend of Jay's,

displays non-gender conforming behavior -- for example, his interest in clothing and men's hairstyles -- he identifies as heterosexual. (Modern Family 1:13 "Fifteen Percent").

The plaintiff identifies a number of characters in Modern Family whom he states are Jewish; as a result, he claims Modern Family is substantially similar to Loony Ben because they both feature Jewish characters. Setting aside the question whether Jewish television characters are unique enough to make two shows containing them substantially similar, the plaintiff has failed to identify a single Jewish character on Modern Family. As discussed above, neither Shell Turtlestein nor Pepper Saltzman are Jewish. Neither are Mitchell, Cameron, or Manny, all of whom are shown celebrating Christmas. (Modern Family 1:10 "Undeck the Halls"). Although a character named Brenda Feldman is referred to, her religion is not stated. (Modern Family 1:1 "Pilot"). Finally, it is irrelevant whether the actors who play characters on Modern Family are Jewish -- as discussed above, actors are distinct from the characters they portray, and thus an actor cannot impute his religion to the character he depicts. Therefore, the plaintiff has failed to show that substantial similarity exists between any of the characters in Loony Ben and Modern Family.

c. <u>Setting</u>

The plaintiff observes that both Loony Ben and Modern Family

38

are set in Los Angeles, California.  (Am. Compl., ¶¶ 166-67).  He states that "at the time Plaintiff wrote and copyrighted 'Loony Ben' very few if any primetime television shows were set in Los Angeles."  (Pl. Memo. at 29).  The choice of Los Angeles as a setting is not in itself copyrightable, regardless of the number of television shows set there.  See Green v. Proctor & Gamble, Inc., 709 F. Supp. 418, 421 (S.D.N.Y. 1989) ("'[A] copyright does not protect its owner from the use by others of the ideas, themes, locale or characters in his copyrighted work.'" (quoting Fuld v. National Broadcasting Co., 390 F. Supp. 877, 881 (S.D.N.Y. 1975))); Bevan v. Columbia Broadcasting System, Inc., 329 F. Supp. 601, 605-07 (S.D.N.Y. 1971) (finding play and television show not substantially similar despite both being set in German POW camps). The plaintiff does not allege that the Treatment's setting generated any copyrightable scenes or plotlines related to Los Angeles; he also does not point to any more specific settings included in both works.  He has thus failed to establish a substantial similarity between the settings depicted in the Treatment and in Modern Family.

d. Format and Pace

    The plaintiff argues that Loony Ben and Modern Family are substantially similar because they are both fast-paced situation comedies that utilize slapstick humor and feature large, ensemble

casts.   (Am. Compl., ¶¶ 78, 85; Pl. Memo. at 29-30).   This
characterization does not bear examination.  In the first instance,
Modern Family is significantly faster paced than Loony Ben.  As
discussed above, the Treatment contains only fifteen scenes whereas
a typical Modern Family episode contains almost twice as many.
That necessarily makes Modern Family a faster-paced show, with
shorter scenes and more frequent cuts between them, since both
shows are timed to last thirty minutes per episode.  (Pl. Memo. at
29).  As a result, the pace of Loony Ben is not substantially
similar to that of Modern Family.

       In addition, although both works are situation comedies,
Modern Family employs a mock documentary format, while the
Treatment uses a more traditional format where characters speak to
each other rather than directly to the audience.  The plaintiff
tries to elide this distinction by highlighting a single instance
in which Ben, during a conversation with Rosa, states as an aside,
"Wait a minute, how'd she know about the party Saturday?  Gasp, the
Martians must have told her."  (Pl. Aff., ¶ 13; Treatment at 8).
This comparison is unsustainable.  There is no indication in the
Treatment that Ben is speaking to the audience, rather than to
himself, when making this comment; even if he were, a single aside
is far from the multiple scenes in every Modern Family episode
during which various characters speak directly to the audience for

protracted periods.  (E.g., Modern Family 1:1 "Pilot"); cf. Willis, 2001 WL 1352916, at *5 (noting that copyrighted work and allegedly infringing work both depict "a character speaking to the audience" but finding no substantial similarity because "the use of this device in the two works is entirely different").  And although both shows employ slapstick comedy, this style of humor is not copyrightable and the specific examples of such humor in the treatment and in Modern Family bear no resemblance to one another.  (Am. Compl., ¶¶ 80-81).

The plaintiff also argues that both works utilize the same format because Dr. Schwartz, a psychotherapist, encourages Ben to "bear[] [sic] his soul" in the same way that the presence of the documentary filmmaker in Modern Family causes its characters to "bear [sic] their souls" to the camera.  (Am. Compl., ¶¶ 157-62).  This comparison, while interesting, is insufficient to transform Loony Ben into a mock documentary-style show.  Dr. Schwartz is an actual character who appears in the Treatment and engages in dialogue with other characters.  Even during the therapy session, Ben does not speak to the camera or even to himself -- he talks directly to Dr. Schwartz, who responds substantively, thus creating a dialogue between them.  (Treatment at 6-7).  As a result, there is no substantial similarity between the format of Loony Ben and that of Modern Family.

Finally, although both Loony Ben and Modern Family have a large cast of characters, only Modern Family has a true ensemble cast, where the various characters share roughly equal screen time and plotlines.  (E.g., Modern Family 1:1 "Pilot").  Loony Ben focuses primarily on the character of Ben.  Ben receives the most lines of any character and appears in all but two of the pilot episode's fifteen scenes.  (Treatment at 6-14).  He is the first character listed in the cast list and the first character described in the Treatment.  (Treatment at 1-3).  Even the Treatment's description of Loony Ben revolves around Ben:

> With the help of his trusted Beverly Hills psychiatrist, dysfunctional handyman Ben Figiwitz, while paying alimony to two ex-wives and child support for two incorrigible kids, strives to live in a functional world, make ends meet, and have a traditional, heterosexual relationship, even though when a young child both his parents announced that they were gay.

(Treatment at 3).  This description reflects the fact that Loony Ben focuses primarily on its single, central character -- Ben -- while the other characters serve as foils reflecting Ben's experiences and advancing his development.  This format is entirely distinct from the ensemble format of Modern Family.  Therefore, the format and pace of these works are not substantially similar.

### e. Total Concept and Feel

The plaintiff argues that Loony Ben and Modern Family share identical concepts in that they both depict a large, non-

traditional, dysfunctional, contemporary American family that includes individuals of various races, ethnicities, sexual orientations, ages, and marital statuses. (Am. Compl., ¶¶ 88-115). The plaintiff claims that he specifically designed Loony Ben to contain a large and diverse family so as to attract a broad viewership, both domestically and internationally, a strategy that he accuses the defendants of copying. (Am. Compl., ¶¶ 58, 71, 172-73). Yet despite the plaintiff's protestations, the Treatment makes clear that Loony Ben's focus is not on the family (Am. Compl., ¶¶ 86-87, 163-65) but rather on the title character and his struggle to balance his mental health, familial, and identity issues (Treatment at 3).[6] Although the Revised Treatment states that "Loony Ben centers on the most basic societal institution -- the family," it also explains that "Ben is like the center of a wheel and the other characters are the spokes, all interconnected

---

[6] I note that in making this argument, the plaintiff frequently refers to a revised version of the Treatment (the "Revised Treatment") that he submitted with his Amended Complaint. (Revised "Loony Ben" Pilot ("Am. Treatment"), attached as Exh. A to Am. Compl.). The parties disagree as to whether the Revised Treatment is protected by a valid copyright and, as a result, whether its contents are appropriately considered as part of the plaintiff's copyright infringement claim. (Pl. Memo. at 2; Def. Memo. at 6 n.8). However, I need not decide that question here because the differences between the Treatment and the Revised Treatment are negligible and do not affect this analysis -- even considering the additional material contained in the Revised Treatment, the plaintiff's copyright infringement claim still fails as a matter of law.

to each other through their relationship to Ben." (Am. Treatment
at 3-4). Thus, although Loony Ben does contain a large, diverse
family, it is the title character who is the actual focus of the
work and around whom its plot, dialogue, and concept center. In
contrast, Modern Family spreads its attention between the various
members of the featured family and presents themes that are broadly
applicable to the family as a whole. Thus, the concepts behind
Loony Ben and Modern Family are not substantially similar.

It is unsurprising given the significant differences
highlighted above that Loony Ben and Modern Family do not share a
common feel. Subjective qualities such as the tone, style, and
sense of humor evinced by each work differ dramatically. After
reviewing both works, I conclude that a reasonable jury could not
find that they are substantially similar, and I therefore recommend
dismissing the plaintiff's copyright infringement claim.

C. Contributory and Vicarious Copyright Infringement

A party engages in contributory copyright infringement where
"'with knowledge of the infringing activity,' the party 'induces,
causes, or materially contributes to the infringing conduct of
another.'" Centrifugal Force, Inc. v. Softnet Communication, Inc.,
No. 08 Civ. 5463, 2011 WL 744732, at *4 (S.D.N.Y. March 1, 2011)
(quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
§ 12.04). Vicarious copyright infringement arises where a party

"'had a right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials.'" <u>Agence France Presse v. Morel</u>, __ F. Supp. 2d __, __, No. 10 Civ. 2730, 2011 WL 147718, at *7 (S.D.N.Y. Jan. 14, 2011) (quoting <u>Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.</u>, 118 F.3d 955, 971 (2d Cir. 1997)). Neither contributory nor vicarious copyright infringement can exist without an underlying finding of direct infringement. <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005) ("One infringes . . . vicariously by profiting from direct infringement . . . ."); <u>Faulkner v. National Geographic Enterprises Inc.</u>, 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement."). Because the plaintiff has failed to allege direct infringement of his copyright, I recommend that his claims for contributory and vicarious copyright infringement also be dismissed.

    D.  <u>Idea Misappropriation</u>[7]

---

[7] Having recommended dismissal of the plaintiff's federal law claims, I would typically recommend that the Court decline supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(c).  However, the plaintiff has alleged diversity jurisdiction, based on 28 U.S.C. § 1332(a), and has pled both complete diversity and satisfaction of the amount in controversy requirement with respect to his state law claims.  (Am. Compl., ¶¶ 5, 9-28, 286, 303, 333).  I will therefore address these claims on their merits.

New York recognizes the tort of idea misappropriation when the plaintiff establishes that (1) his "allegedly misappropriated ideas were novel and concrete" and (2) there existed "a legal relationship" between the parties. Broughel v. Battery Conservancy, No. 07 Civ. 7755, 2009 WL 928280, at *10 (S.D.N.Y. March 30, 2009) (internal quotation marks omitted). However, a claim for idea misappropriation is preempted where "the facts alleged in the complaint make it impossible to separate a claim of misappropriation of [the] idea from a claim of misappropriation of the copyrightable literary work through which that idea was expressed." Katz Dochrermann & Epstein, Inc. v. Home Box Office, No. 97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. March 31, 1999); see also Flaherty v. Filardi, No. 03 Civ. 2167, 2007 WL 2734633, at *6 n.4 (S.D.N.Y. Sept. 19, 2007) (finding misappropriation claim preempted where it arose from ideas embodied in previously copyrighted screenplay); cf. Maurizio v. Goldsmith, 84 F. Supp. 2d 455, 468-69 (S.D.N.Y.) (declining to preempt idea misappropriation claim stemming from contribution of ideas to book outline), aff'd, 230 F.3d 518 (2d Cir. 2000).

Here, the idea that gives rise to the misappropriation claim was fully expressed in the Treatment, which was copyrighted in 2006. (Am. Compl., ¶ 30). The plaintiff argues that his idea misappropriation claim is nevertheless not preempted because the

46

defendants had access to his idea not only through the Treatment, but also through later non-copyrighted works, including the Revised Treatment and "other writings."   (Pl. Memo. at 32).   Yet the plaintiff does not allege that these later works contained ideas that were not also contained in the Treatment -- in fact, his reference throughout this section to "the idea" suggests that it is the same "idea" that is being expressed in both the Treatment and the later works.  (Pl. Memo. at 32). Moreover, the only additional work containing "the idea" that the plaintiff has pointed to with any particularity is the Revised Treatment, which, as discussed above, does not contain any ideas not already expressed in the Treatment.  Therefore, the plaintiff's idea misappropriation claim is preempted, and I recommend that it be dismissed.

E. Defamation

Defamation consists of the "'twin torts'" of libel and slander.  Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001) (quoting Hogan v. Herald Co., 84 A.D.2d 470, 474, 446 N.Y.S.2d 836, 839 (4th Dep't), aff'd, 58 N.Y.2d 630, 458 N.Y.S.2d 538 (1982)). Under New York law, the elements of a cause of action for slander are:

> (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege.

47

Id. at 265-66 (internal citations omitted).  A cause of action for libel includes the additional element that the defamatory statement be written rather than spoken.  See DiBella v. Hopkins, 403 F.3d 102, 110 (2d Cir. 2005).  For a plaintiff to prove the "of and concerning" element, he must show that "'the libel designates the plaintiff in such away as to let those who knew him understand that he was the person meant.'"  Stern v. News Corp., No. 08 Civ. 7624, 2010 WL 5158635, at *5 (S.D.N.Y. Oct. 14, 2010) (quoting Felter v. Houghton Mifflin Co., 369 F.2d 650, 651 (2d Cir. 1966)), report and recommendation adopted, 2010 WL 5158637 (S.D.N.Y. Dec. 16, 2010); accord Kirch v. Liberty Media Corp., 449 F.3d 388, 398 (2d Cir. 2006); Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980); Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation, No. 06 CV 1260, 2009 WL 4547792, at *14 (E.D.N.Y. Dec. 1, 2009) (dismissing defamation claim because "those who know [the alleged victims] would not know that they were the target of the allegedly libelous statement" and citing cases).

Here, Mr. Alexander claims that the defendants defamed him in two ways.  First, they libeled him by crediting defendants Steven Levitan and Christopher Lloyd with creating Modern Family in printed materials and in the show credits.  (Am. Compl., ¶¶ 315-17).  Second, they slandered him through "false and misleading [oral] statements" to the effect that Mr. Levitan and Mr. Lloyd are

48

the creators of Modern Family.  (Am. Compl., ¶¶ 312, 314).  The plaintiff claims that these statements, "indirectly by implication and negative inference," have injured his professional reputation and caused him "humiliation, degradation, and mental anguish." (Am. Compl., ¶¶ 312, 320).

However, none of these alleged defamatory statements identify the plaintiff, by name or by implication.  In fact, it is the defendants' refusal to assign any explicit or implicit credit to Mr. Alexander for creating Modern Family that comprises the gravamen of his complaint.  What the plaintiff alleges in his defamation claim, therefore, is not defamation but rather copyright infringement -- that the defendants used his work without giving him credit or compensation.  Because the plaintiff has failed to allege that the defendants made any statements in which he was or could be identified, I recommend that his defamation claim be dismissed.

F.  Additional Claims and Defenses

The plaintiff's final claim seeks to "pierce the veil" of various defendant corporations, thus holding their principals and the individually-named defendants liable for the alleged wrongs committed against him.  (Am. Compl., ¶¶ 339-77).  Because I recommend dismissing all of the plaintiff's substantive claims, I also recommend that this claim be dismissed since it has no

49

viability in the absence of an underlying substantive claim.

Similarly, the moving defendants argue that the plaintiff has failed to allege personal jurisdiction over defendants British Sky Broadcasting Group, PLC, RTL Group, Sky Italia, and FOXTEL Management Pty, Ltd. (the "foreign defendants"). (Def. Memo. at 39-40). The plaintiff claims that he has properly asserted jurisdiction over the foreign defendants and, in the alternative, asks for an opportunity to re-plead his complaint to properly allege such jurisdiction. (Pl. Memo. at 39). Because I recommend dismissing all of the plaintiff's claims against the foreign defendants, their personal jurisdiction defense is moot, and I will not address it here.

Conclusion

For the reasons set forth above, I recommend that the moving defendants' motion be granted and that the Amended Complaint be dismissed as to them. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d)of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty,

Room 735, and to the chambers of the undersigned, Room 1960, 500

Pearl Street, New York, New York 10007.  Failure to file timely

objections will preclude appellate review.


                         Respectfully submitted,



                         _James C. Francis IV_
                         JAMES C. FRANCIS IV
                         UNITED STATES MAGISTRATE JUDGE


Dated:     New York, New York
           May 27, 2011


Copies mailed this date to:

Martin Alexander
2506 S. Schenley Avenue
Youngstown, OH  44511

Joseph F. Richburg, Esq.
CBS Law Department
51 West 52nd Street
New York, New York 10019

Dale M. Cendali, Esq.
Kirkland & Ellis LLP
153 East 53rd Street
New York, New York 10022